IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 23, 2015 at Knoxville

## CHRISTOPHER ALLEN CUMMINS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Wayne County**
**No. 15417     Robert L. Holloway, Jr., Judge**

———————————

**No. M2014-01197-CCA-R3-PC – Filed July 9, 2015**

———————————

The petitioner, Christopher Allen Cummins, appeals the denial of his petition for post-conviction relief. Following our review, we affirm the judgment of the post-conviction court denying the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR. and TIMOTHY L. EASTER, JJ., joined.

M. Wallace Coleman, Jr., Lawrenceburg, Tennessee, for the Appellant, Christopher Allen Cummins.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; T. Michel Bottoms, District Attorney General; and Beverly J. White, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted by a Wayne County Circuit Court jury of the first degree murder of his wife's ex-boyfriend and sentenced to life imprisonment. His conviction was upheld by this court on direct appeal and our supreme court denied his application for permission to appeal. State v. Chris Cummins, No. M2011-02264-CCA-R3-CD, 2012 WL 5193393, at *1 (Tenn. Crim. App. Oct. 22, 2012), perm. app. denied (Tenn. Mar. 5, 2013). The petitioner's wife was an eyewitness to the murder and provided key testimony against the petitioner at his trial, as revealed in our direct appeal opinion:

The victim, Buddy Griggs, was the ex-boyfriend of the [petitioner's] wife, Krystal Cummins. The victim and Ms. Cummins had two young children together. The victim disappeared from his mother's home on April 17, 2010, and his remains were found approximately one month later, after the historic flood of May 2010, in a wooded area. Although both the [petitioner] and Ms. Cummins initially denied any involvement with the victim's death, Ms. Cummins, after giving numerous contradictory statements to the police, implicated the [petitioner] and led police to the victim's remains.

Ms. Cummins testified at trial that the [petitioner] was jealous of her relationship with the victim. According to Ms. Cummins, she had decided to leave the [petitioner] because he manufactured methamphetamine. Ms. Cummins testified she brought the victim to the house where she and the [petitioner] lived because she needed to retrieve her diaper bag prior to leaving the [petitioner]. She unexpectedly found the [petitioner] at home. Ms. Cummins testified that there was no immediate hostility between the victim and the [petitioner] and that the three adults spent time playing with the children. According to Ms. Cummins, the victim had put his two-year-old daughter on the hood of a van and was engaged in making sure she did not fall off when the [petitioner] unexpectedly struck him from behind on the right side of the head with a sleeve cut from a thermal shirt, filled with rocks, and secured at either end. Ms. Cummins testified that the [petitioner] then choked the victim with a wire cut from an exercise machine and fitted with homemade handles which she had noticed in his pocket earlier. The [petitioner] wrapped the victim in plastic and placed him in the trunk of the car. The [petitioner] and Ms. Cummins then drove the car with the children inside to the victim's mother's house and left the children there. Ms. Cummins also testified that they stopped by a gas station. After driving various places in an attempt to hide the body and making a few more stops, the [petitioner] rolled the victim down a ridge. The [petitioner] then burned various items which might have had physical evidence on them.

The [petitioner] gave a statement in which he denied any knowledge of the victim's death. However, after he was informed that Ms. Cummins, in one of her statements, had told the police that he and the victim had been fighting and he killed the victim, the [petitioner] gave a second statement which blamed Ms. Cummins for the victim's death. In this statement, he asserted that Ms. Cummins had told him the victim attempted to rape her

and she hit him with a rock and choked him with some wire, then put him in the trunk of the car. The [petitioner] stated that Ms. Cummins removed the body from the trunk at their home and wanted to burn the body, but he would not let her. He stated that she put the victim's body back in the trunk and left briefly and that he thought she had removed the body from the trunk. They then took the children to the victim's mother's house, went by the gas station, and drove various places. He stated that he did not realize the victim was still in the car until Ms. Cummins expressed a desire to go down a road to dump the body. When they got home, they burned some wood, but he would not let her burn the body at their home. He stated that he did not know when the body was removed from the trunk and that Ms. Cummins had burned several items.

Id.

On the Friday afternoon before the Monday start of trial, the prosecutor learned about an inmate, Brian Smith, who testified at trial that the petitioner confessed the murder to him during their time together at the jail:

The inmate testified at trial that the [petitioner] had told him and Steven Beersdorf--who was also incarcerated and who was trying to silence a prisoner who planned to testify against him--that the [petitioner] had killed before and was not scared to do it again. The inmate testified that the [petitioner] then privately told him that he had killed the victim with a sock full of rocks and strangled him with a wire, and that he did it so that the victim would not take the kids away because the kids "would get checks" until they turned eighteen. The [petitioner] later, according to the inmate, showed him the photographs of the victim's remains and pointed out a fracture that he said was caused by hitting the victim with the rocks. On cross-examination, the inmate testified that at one point the [petitioner] had animosity towards him because the inmate had called a guard to assist another prisoner who had a seizure while the [petitioner] and another man were "smacking" him for being a child molester. According to the inmate, the [petitioner] showed him the pictures of the victim's remains in order to frighten him. Jeremy Holt testified on behalf of the [petitioner] that he had been incarcerated with the inmate witness and that the inmate told him that someone wanted the inmate to testify against the [petitioner]. Mr. Holt testified that the inmate was trying to get information about the case against the [petitioner]. The trial court allowed defense counsel to interview Mr. Beersdorf, who was allegedly present when the [petitioner] confessed to having killed someone. Although the record shows that the [petitioner]

3

called Mr. Beersdorf and that Mr. Beersdorf testified, the record is missing the volume in which Mr. Beersdorf's testimony is recorded.

Id. at *2.

Defense counsel presented evidence in support of the petitioner's claim that his wife was the one who perpetrated the murder:

The defense put on proof that Ms. Cummins had, in a conversation with an inmate who was housed with her in prison, confessed to killing someone and that she told the victim's aunt by telephone that she had killed the victim. The defense proof also included evidence that Ms. Cummins had choked a woman with whom she was fighting and that she had thrown a boiling teapot at the victim's head.

Id. at *3.

The sole issue the petitioner raised on direct appeal was whether the trial court committed reversible error by denying his motion for a continuance on the basis "that he was only made aware of [the inmate] witness on the morning the trial began[.]" Id. at *1. We found no abuse of discretion in the trial court's denial of the motion, noting that the petitioner had shown "no prejudice, bad faith, or undue advantage on the part of the State," that the prosecution provided the petitioner with Mr. Smith's criminal history to aid in cross-examination, and that the trial court extended the trial an extra day to allow the petitioner to call Mr. Beersdorf to testify. Id. at *4 (internal quotations and citations omitted).

On September 25, 2013, the petitioner filed a *pro se* petition for post-conviction relief in which he raised claims of prosecutorial misconduct, ineffective assistance of counsel, and various errors by the trial court. With respect to his ineffective assistance of counsel claim, he alleged that counsel provided ineffective assistance at trial for, among other things, not objecting to the prosecutor's statement in opening that the petitioner was manufacturing methamphetamine. The petitioner alleged that counsel provided ineffective assistance on appeal "by failing to incorporate significant and obvious issues in the petitioner's appellate brief," which included counsel's failure to raise the issue of whether the evidence was sufficient to sustain the verdict. With respect to his "trial court error" claim, he alleged that the trial court, among other things, erred by "failing to properly rule on motions."

The petitioner's allegations of trial court error and ineffective assistance of counsel are slightly different in his brief than in his petition and at the post-conviction

4

evidentiary hearing. On appeal, the petitioner alleges that trial counsel was defective, thereby prejudicing his case, by not objecting to evidence that the petitioner "cooked meth," by improperly influencing the petitioner not to testify at trial, and by not calling a witness to contradict inmate Smith's testimony that the petitioner showed Mr. Smith a photograph of the victim's injuries while in jail. The petitioner alleges that the trial court committed reversible error by not issuing written rulings on all pretrial motions, by allowing the introduction of prior bad acts of the petitioner, and by not granting the petitioner's motion for a trial continuance. We will, therefore, for the most part confine our summary of the evidentiary hearing to testimony that is relevant to these issues.

The petitioner testified at the hearing that he and his appointed counsel did not learn about Mr. Smith until the morning of the trial, despite the fact that the prosecutor had learned of his existence the previous Friday. The petitioner believed that, had the prosecutor informed them of the witness when he first learned of him, trial counsel would have had time to investigate Mr. Smith's background and proposed testimony. For instance, had trial counsel known earlier of Mr. Smith's claim that the petitioner had shown him photographs of the victim's body, counsel could have presented evidence to show that the petitioner was not provided any photographs of the victim in discovery and had no photographs in his possession.

The petitioner complained that trial counsel not only failed to object to the prosecutor's statement in opening that the petitioner was "cooking meth," but also himself made a similar prejudicial comment in his closing argument. He further complained about counsel's having raised only a single issue on direct appeal and not having ensured that the entire record of the trial was included in the record on appeal. The petitioner said he believed that all four of the issues counsel raised in the motion for new trial should have been raised in the direct appeal.

On cross-examination, the petitioner acknowledged that trial counsel was provided with Mr. Smith's criminal history and was given the opportunity to interview Mr. Smith. He further acknowledged that the jury heard Mr. Beersdorf's testimony, which contradicted Mr. Smith's testimony about the petitioner's alleged confession to the crime. On redirect examination, he recalled that trial counsel met with him only three times prior to trial. According to his testimony, trial counsel promised to meet with him on the Saturday and Sunday immediately prior to trial to review the case and to prepare him to testify, but trial counsel "never showed up."

On recross examination, the petitioner testified that he wanted to testify at trial but, because trial counsel never prepared his testimony and told him that counsel's wife thought he should not testify, he agreed not to take the stand. The petitioner acknowledged, however, that he did not allege in his petition that trial counsel had forced

him not to testify. He further acknowledged that he had thirty-four felony forgery convictions, which the State could have used to impeach his testimony.

Trial counsel, called as a witness by the State, testified that the petitioner's use and production of methamphetamine was an issue that was "so intertwined" in the facts of the case that he did not "see any way that that could be taken out." As for his having raised only the single issue on appeal, trial counsel explained that he thought the trial judge had ruled in the defense's favor on a lot of the issues throughout trial, thus "limiting what [they] could do on appeal just because those issues weren't there." Counsel said he did not believe, given the evidence, that he could have raised a sufficiency of the evidence issue with a "straight face." Counsel stated that his investigator found witnesses who were able to testify that the petitioner's wife had confessed to the murder.

Trial counsel testified that he met with the petitioner "quite a bit, especially . . . when [they] were getting ready for . . . trial." He discussed with the petitioner the possibility of his testifying, including the fact that he had thirty-four felony forgery convictions and had given two different stories to the police about the crime. Trial counsel said the petitioner was "[a]ll for not testifying" at the conclusion of their discussions. At one point during trial, the petitioner mentioned a desire to testify, but he changed his mind after another discussion with counsel in which counsel again advised him not to testify. Counsel recalled that he probably discussed the issue with his wife, who had witnessed a good portion of the trial, and also probably conveyed to the petitioner his wife's opinion that the petitioner should not testify. He said, however, that whether or not to testify was ultimately the petitioner's decision.

Trial counsel testified that he objected to the last minute jailhouse witness and moved for a continuance, which was denied. He said that Mr. Smith was a devastating witness and that the more he cross-examined him, "the worse it got." He was given Mr. Smith's criminal record and afforded an opportunity to talk to him before trial, but Mr. Smith declined to speak with him.

Trial counsel testified that he issued a subpoena for Jamie Staggs, who had, supposedly, seen the petitioner turn "white as a sheet" when Mr. Staggs asked him about the victim. Counsel said he had no knowledge of Mr. Staggs having confessed to the murder, and if he had had that information, he could have put him on the stand and questioned him about it. Trial counsel testified that he provided discovery to the petitioner, which would have included copies of the photographs in the case.

On cross-examination, trial counsel testified that the prosecutor told him during a telephone conversation on the Sunday before trial that he might have a surprise for him at trial. He said he told the prosecutor that he hated surprises and asked him to let him

6

know what it was, but the prosecutor chose not to reveal the nature of the surprise, or the name of the witness, until the morning of trial. He agreed that had he known about the witness a month before trial, he could have thoroughly investigated his background and tried to talk to him about his testimony. Trial counsel said he knew he prepared for the trial over the weekend, but he could not recall if he visited the petitioner in the jail on that Saturday or Sunday. Finally, trial counsel testified that, in his opinion, arguing against the sufficiency of the evidence on direct appeal would have been "frivolous" given the amount of evidence against the petitioner.

The petitioner testified in rebuttal that the only photograph he ever received was one of an automobile; he never had any photographs of the victim's body or remains in his possession.

On May 22, 2014, the post-conviction court entered an order denying the petition, finding that the petitioner's claim of prosecutorial misconduct based on the late disclosure of the witness was an issue that had already been litigated on direct appeal and that the petitioner failed to show either a deficiency in counsel's performance or a resulting prejudice to his case. Thereafter, the petitioner filed a timely appeal to this court.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998).

### I.     Ineffective Assistance of Counsel

The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's

deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The petitioner argues on appeal that counsel was ineffective for not objecting to evidence that the petitioner manufactured methamphetamine, for improperly influencing the petitioner not to testify, and for not calling a witness from the jail to contradict Brian Smith's testimony that the petitioner showed him a photograph of the victim's body. The record, however, supports the post-conviction court's findings that the petitioner failed to show either a deficiency in counsel's performance or prejudice to the petitioner's case.

Trial counsel's testimony, which was accredited by the post-conviction court, established that counsel had several discussions with the petitioner about testifying and advised him of the reasons he thought he should not testify, but left the ultimate decision to the petitioner. Trial counsel also explained that the methamphetamine evidence was so intertwined with the facts of the case that he saw no way to exclude it from the trial. As for counsel's failure to call a witness to contradict Brian Smith's testimony that the petitioner showed him a photograph of the victim, counsel was not even made aware of Mr. Smith's existence until the morning of trial. Furthermore, since Mr. Smith refused to talk to counsel, counsel had no way of knowing in any detail what the substance of his testimony would be. In sum, the petitioner has not met his burden of demonstrating that he was denied the effective assistance of counsel. Accordingly, we conclude that the petitioner is not entitled to post-conviction relief on the basis of this claim.

## II.    Prosecutorial Misconduct

The petitioner argues that he is entitled to a new trial because the prosecutor deliberately concealed a material witness until the morning of trial, violating his due process rights to a fair trial and prejudicing his defense. The post-conviction court made the following findings of facts and conclusions of law with respect to this claim:

> Petitioner claims the prosecution failed to timely disclose as a witness an inmate who had been in jail with Petitioner. This same issue was raised on appeal in the context of the Trial Court erring by failing to grant a continuance because the witness was not disclosed to Petitioner until the morning of the first day of the trial. The Court of Criminal Appeals fully addressed the State's last minute disclosure of the witness, the reasons for the State not disclosing the witness earlier, the steps taken by the Court to minimize any prejudice to the defense, and whether the Court erred in refusing to grant a continuance. The Court of Criminal Appeals found no reversible error and affirmed the Trial Court. Petitioner's ground for relief related to prosecutorial misconduct is without merit because the matter was previously determined by [the] Court of Criminal Appeals.

We agree with the post-conviction court that the petitioner's "prosecutorial misconduct" claim was determined by this court on direct appeal when we addressed whether the trial court erred by denying the motion for a continuance. Accordingly, we conclude that the petitioner is not entitled to post-conviction relief on the basis of this claim.

### III.    Trial Court Error

Finally, the petitioner argues the trial court committed reversible error by not issuing written rulings on all pretrial motions, allowing the introduction of prior bad acts of the petitioner, and not granting the defense a continuance when the prosecutor did not disclose the material witness until the morning of trial.  These issues, however, have either been previously determined or are waived for failure to raise them before the trial court.  Accordingly, we conclude that the petitioner is not entitled to post-conviction relief on the basis of these claims.

### CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court denying the petition.

_____
ALAN E. GLENN, JUDGE